JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

POLO GARCIA, <u>et al.</u>,

    Plaintiffs,

   v.

WAL-MART STORES INC.,

    Defendant.

Case No. CV 15-5337 FMO (ASx)

**ORDER Re: MOTION TO REMAND**

  Having reviewed and considered all the briefing filed with respect to Plaintiffs' Motion to Remand Pursuant to 28 U.S.C. § 1447 (Dkt. 12, "Motion"), the court concludes that oral argument is not necessary to resolve the Motion. <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15; <u>Willis v. Pac. Mar. Ass'n</u>, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

## <u>BACKGROUND</u>

  On November 27, 2013, plaintiff Eddie Ortiz ("Ortiz") filed a putative class action complaint in the San Mateo County Superior Court[1] against Wal-Mart Stores, Inc. ("Wal-Mart" or "defendant"), seeking to represent a class comprised of "[a]ll current and former hourly-paid or non-exempt California-based (currently residing in California with the intent to remain in California

---

  [1] The complaint was originally filed in the San Mateo County Superior Court, but was transferred to the County of Riverside pursuant to stipulation. (<u>See</u> Dkt. 1-1, Petition for Coordination at ECF 88 n. 1).

1  indefinitely) 'Asset Protection Associates' employed by any of the Defendants within the State of

2  California at any time during the period from four years preceding the filing of this Complaint to

3  final Judgment." (Dkt. 1-7, Ortiz v. Wal-Mart Stores, Inc., Case No. RIC 1403025 (Riverside Cnty.

4  Super. Ct.) ("Ortiz Action"), ECF 1202-17, at ¶ 14).  Ortiz asserted a single claim under California

5  Business and Professions Code §§ 17200, et seq. ("UCL"), which was premised on violations of

6  the California Labor Code for, among other things, failing to pay for all regular and overtime hours

7  worked as well as missed meal and rest periods.  (See id. at ¶¶ 49-65).  Ortiz alleged that Wal-

8  Mart "engaged in a uniform policy and systematic scheme of wage abuse against their hourly paid

9  or non-exempt 'Asset Protection Associates[,]'" and that the "scheme involved, inter alia, failing

10  to pay them for all hours worked, missed meal periods and rest breaks in violation of California

11  law." (Id. at ¶ 28).

12       Nearly six months later, on May 14, 2014, plaintiff Polo Garcia ("Garcia" and together with

13  Ortiz, "plaintiffs"), filed  a putative class action complaint in the Los Angeles County Superior Court

14  against Wal-Mart, seeking to represent a class identical to the class in the Ortiz Action, comprised

15  of "[a]ll current and former hourly-paid or non-exempt California-based (currently residing in

16  California with the intent to remain in California indefinitely) 'Asset Protection Associates'

17  employed by any of the Defendants within the State of California at any time during the period

18  from November 27, 2009 to final judgment." (Dkt. 1-4, Garcia v. Wal-Mart Stores, Inc., Case No.

19  BC545663 (L.A. Cnty. Super. Ct.) ("Garcia Action"), ECF 623-47, at ¶ 13).  Garcia, who was

20  represented by the same counsel or co-counsel representing Ortiz, asserted claims under the

21  California Labor Code.  (See id. at ¶¶ 45-107).  Like Ortiz, Garcia alleged that Wal-Mart "engaged

22  in a uniform policy and systematic scheme of wage abuse against their hourly- paid or non-exempt

23  'Asset Protection Associates[,]'" and that the "scheme involved, inter alia, failing to pay them for

24  all hours worked, missed meal periods and rest breaks in violation of California law."  (Id. at ¶ 25).

25       Wal-Mart sought coordination of the Ortiz and Garcia actions in the state court.  (See Dkt.

26  12, Motion at 1).  On November 21, 2014, the actions were coordinated in the Los Angeles County

27  Superior Court in Wal-Mart Stores Wage and Hour Cases, Case No. JCCP4804 ("Consolidated

28  State Action").  (Dkt. 1-2, Exh. A at ECF 232-34).  In June 2015, the parties submitted a Joint

Initial Status Conference Statement, stating that they "agree that a consolidated amended complaint should be filed." (Dkt. 1-1, Exh. A at ECF 12). On July 2, 2015, plaintiffs filed a Consolidated Class Action Complaint for Damages ("CAC"). (See Dkt. 1-8, Consolidated State Action, ECF 1225-51).

The CAC alleges that plaintiffs, former Wal-Mart Asset Protection Associates ("APAs"), (see Dkt. 1-8, CAC at ¶¶ 19-21), were classified as non-exempt hourly employees, and that Wal-Mart "failed to compensate them for all hours worked, missed meal periods and/or rest breaks." (Id. at ¶ 21). On behalf of themselves and others similarly situated, plaintiffs assert causes of action for violations of the California Labor Code and the UCL. (See id. ¶¶ 47-116). The CAC sets forth the same proposed class as in the Ortiz and Garcia Actions: "All current and former hourly-paid or non-exempt 'Asset Protection Associates' employed by Wal-Mart Stores, Inc. within the State of California at any time during the period from November 27, 2009 to final judgment." (Id. at ¶ 14). The CAC alleges that defendant "engaged in a uniform policy and systematic scheme of wage abuse against their hourly-paid or non-exempt 'Asset Protection Associates[,]'" and that the "scheme involved, inter alia, failing to pay them for all hours worked, missed meal periods and rest breaks in violation of California law." (Id. at ¶ 27). The CAC repeats the allegations in the Ortiz and Garcia actions regarding Wal-Mart's conduct, (compare Dkt. 1-7, Ortiz Action with Dkt. 1-4, Garcia Action and Dkt. 1-8, CAC), and asserts identical claims as in the Garcia Action, (compare Dkt. 1-4, Garcia Action at ¶¶ 45-107 with Dkt. 1-8, CAC at ¶¶ 47-109), along with the UCL claim asserted in the Ortiz Action. (See Dkt. 1-7, Ortiz Action at ¶¶ 49-65; Dkt. 1-8, CAC at ¶¶ 110-16).

On July 15, 2015, 13 days after the CAC was filed in the state court, defendant removed the consolidated state action to this court asserting jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) & 1453. (See Dkt. 1, NOR at 2). On July 24, 2015, the court issued an Order to Show Cause Re: Remand, questioning "whether the claims of the individual class members exceed $5,000,000 in the aggregate" and whether "removal was untimely." (See Dkt. 9, Court's Order of July 24, 2015, at 1). Defendant responded to the Order to Show Cause, (see Dkt. 10, Defendant Wal-Mart Stores, Inc.'s Response to Order to Show Cause Re: Remand ("OSC Response")), and plaintiffs filed a reply. (See Dkt. 11, Plaintiff's Reply

1   to Defendant Wal-Mart Stores, Inc's Response to Order to Show Cause Re: Remand ("OSC

2   Reply")).  Shortly thereafter, plaintiffs filed the instant Motion.  (See Dkt. 12, Motion).

3   **LEGAL STANDARD**

4   Removal of a civil action from the state court where it was filed is proper if the action might

5   have originally been brought in federal court.  See 28 U.S.C. § 1441(a) ("Except as otherwise

6   expressly provided by Act of Congress, any civil action brought in a State court of which the district

7   courts of the United States have original jurisdiction, may be removed by the defendant or the

8   defendants, to the district court[.]").  "CAFA provides expanded original diversity jurisdiction for

9   class actions meeting the amount in controversy and minimal diversity and numerosity

10  requirements set forth in 28 U.S.C. § 1332(d)(2)."  United Steel, Paper & Forestry, Rubber, Mfg.,

11  Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co., 602 F.3d 1087,

12  1090-91 (9th Cir. 2010); see Ibarra v. Manheim Invs., Inc., 775 F.3d 1193, 1195 (9th Cir. 2015)

13  ("A CAFA-covered class action may be removed to federal court, subject to more liberalized

14  jurisdictional requirements[.]").  Under CAFA, "district courts shall have original jurisdiction of any

15  civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive

16  of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a

17  citizen of a State different from any defendant[.]"  28 U.S.C. § 1332(d)(2).

18  "[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to

19  facilitate adjudication of certain class actions in federal court."  Dart Cherokee Basin Operating

20  Co., LLC v. Owens, 135 S.Ct. 547, 554 (2014).  However, "under CAFA the burden of establishing

21  removal jurisdiction remains, as before, on the proponent of federal jurisdiction."  Abrego Abrego

22  v. The Dow Chemical Co., 443 F.3d 676, 685 (9th Cir. 2006) (per curiam) (noting that Congress

23  passed CAFA in the context of a "longstanding, near-canonical rule that the burden on removal

24  rests with the removing defendant").  "A defendant seeking removal of a putative class action must

25  demonstrate, by a preponderance of evidence, that the aggregate amount in controversy exceeds

26  the jurisdictional minimum."  Rodriguez v. AT&T Mobility Servs. LLC, 728 F.3d 975, 981 (9th Cir.

27  2013).  "When plaintiffs favor state court and have prepared a complaint that does not assert the

28  amount in controversy, or that affirmatively states that the amount in controversy does not exceed

4

$5 million, if a defendant wants to pursue a federal forum under CAFA, that defendant in a jurisdictional dispute has the burden to put forward evidence showing that the amount in controversy exceeds $5 million, to satisfy other requirements of CAFA, and to persuade the court that the estimate of damages in controversy is a reasonable one." Ibarra, 775 F.3d at 1197. "The parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." Id. (internal quotation marks omitted). "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." Id. at 1198.

Title 28 U.S.C. § 1446(b)(1) requires a defendant to file a notice of removal "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." However, "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). The removal of class actions is also governed by 28 U.S.C. § 1446. See 28 U.S.C. § 1453(b) ("A class action may be removed to a district court of the United States in accordance with section 1446."). "A case becomes 'removable' for purposes of section 1446 when the CAFA ground for removal is disclosed." Jordan v. Nationstar Mortg. LLC,, 781 F.3d 1178, 1184 (9th Cir. 2015).

## DISCUSSION

I.    AMOUNT IN CONTROVERSY.[2]

Plaintiffs assert that "[b]ecause the [CAC] does not state the frequency of the alleged wage and hour violations for the putative class, the onus is on Defendant to present evidence that the violation rates it presents are more than just conjecture." (Dkt. 12, Motion at 9). They assert that

---

[2]  Although the parties' briefing addressed whether defendant's removal was timely before addressing the amount in controversy requirement, the court will consider the latter issue first because it provides context for the court's discussion of the timeliness issue.

1   the declaration provided by defendant in support of its calculations is not competent evidence, and

2   even if it were, defendant's calculation of penalties for minimum wage, waiting time, and wage

3   statement violations are unsupported and speculative.  (See id. at 9-16).

4        Defendant responds that while it may not rely on conjecture, it may "rely upon reasonable

5   assumptions."  (See Dkt. 13, Defendant Wal-Mart Stores, Inc.'s Opposition to Motion to Remand

6   ("Opp.") at 9).  According to defendant, its 100% violation rate assumption is not unreasonable

7   because plaintiffs allege in their CAC that "the violations occurred at all material times as part of

8   an alleged uniform policy and systematic scheme of wage abuse," (id.), and plaintiffs have failed

9   to suggest a contrary violation rate or present any evidence to the contrary.  (See id. at 9-10)

10  (internal quotation and alteration marks omitted).

11       As an initial matter, the court is not aware of any authority – nor has defendant cited to any

12  – stating that a plaintiff must submit evidence challenging the amount in controversy.  See, e.g.,

13  Townsend v. Brinderson Corp., 2015 WL 3970172, *3 (C.D. Cal. 2015) ("Contrary to [defendant's]

14  contention, neither Dart Cherokee nor Ibarra mandate that a plaintiff must always submit evidence

15  challenging the amount in controversy.").  A plaintiff is required "to come forward with contrary

16  evidence only when the removing defendant has first come forward with sufficient evidence to

17  meet its initial burden."[3]  Id.; see Ruano v. Sears Roebuck & Co., 2015 WL 6758130, *2 (C.D. Cal.

18  2015) ("Plaintiffs can also submit evidence in opposition, but there is no requirement that they do

19  so[.]") (citation omitted); Vitale v. Celadon Trucking Servs., 2015 WL 5824721, *2 (C.D. Cal. 2015)

20

21       [3] Defendant points to Unutoa v. Interstate Hotels & Resorts, Inc., 2015 WL 898512, *2-3 (C.D.
22  Cal. 2015) and Lopez v. Aerotek, Inc., 2015 WL 2342558, *3 (C.D. Cal. 2015), arguing that these
    cases found a 100% violation rate proper when the plaintiff failed to submit evidence to contest
23  such a violation rate.  (See Dkt. 13, Opp. at 10).  In both of those cases, however, the courts found
    that the removing defendant had put forth sufficient evidence of the amount in controversy.  See
24  Unutoa, 2015 WL 898512, at *3 (first finding the defendant's assumption of violation rates to be
    "sufficiently supported by [plaintiff's] allegations and Defendants' evidence" before noting that
25  plaintiff had not offered an alternative); Lopez, 2015 WL 2342558, at *3 (while noting that plaintiff
    did not suggest an alternative, finding that defendant "properly used a chain of reasoning based
26  on the Complaint to conclude that the amount-in-controversy requirement is met in this case").
    The cases did not say that putting forth such evidence was required, nor did those courts find that
27  defendant satisfied its burden because the plaintiff failed to offer an alternative calculation.  The
28  court declines to make such a finding here.

6

(same).  As this court previously noted, "[n]umerous cases after Dart Cherokee have concluded, either explicitly or implicitly, that while a plaintiff may rebut defendant's evidence with his or her own evidence, he or she need not do so in order to prevail on a motion to remand."  Townsend, 2015 WL 3970172, at *3 (collecting cases).  Once a defendant satisfies its "burden to put forward evidence showing that the amount in controversy exceeds $5 million," Ibarra, 775 F.3d at 1197, "the burden [then] shifts to plaintiff to produce evidence."  Townsend, 2015 WL 3970172, at *3.  Thus, the question remains whether defendant has satisfied its burden by a preponderance of the evidence that the amount in controversy satisfies the CAFA threshold.  For the reasons set forth below, the court finds that it has not.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure."  Ibarra, 775 F.3d at 1198.  In addition, "courts disavow the use of a 100% violation rate when calculating the amount in controversy absent evidentiary support."  Moreno v. Ignite Rest. Grp., 2014 WL 1154063, *5 (N.D. Cal. 2014); see, e.g., Letuligasenoa v. Int'l Paper Co., 2014 WL 2115246, *5 (N.D. Cal. 2014) (rejecting application of 100 percent violation rate where unsupported by the record, stating that it would "improperly shift the burden to plaintiff to refute speculative assertions of jurisdiction and establish that there is no jurisdiction") (internal quotation marks omitted); Marshall v. G2 Secure Staff, LLC, 2014 WL 3506608, *2 (C.D. Cal. 2014) ("[P]arties may not rely on the assumption that the 100-percent violation rule applies without supporting the assumption with evidence.") (emphasis omitted).

Here, defendant has not put forth any competent evidence to support its assumption of a 100% violation rate for the three alleged labor code claims, (see Dkt. 1-8, CAC at ¶¶ 76-87 & 94-100) (fourth, fifth, and seventh causes of action), on which defendant relies for purposes of removal.  Defendant bases its purported number and rate of alleged labor law violations on the declaration of Steven Bedi ("Bedi"), a Senior Regional Asset Protection Manager.  (See Dkt. 10-1, Declaration of Steven Bedi [] ("Bedi Decl.")).  However, Bedi's declaration is insufficient, as it is simply a conclusory, five-paragraph declaration that sets forth only the approximate number of employees in the putative class, the approximate number of those who left defendant's

employment from May 14, 2011, to July 29, 2015, and the approximate number of wage statements (initial and subsequent) that the putative class members received from May 14, 2013, to July 29, 2015.  (See id. at ¶¶ 1-5); see also Garibay v. Archstone Cmtys. LLC, 539 F.App'x 763, 764 (9th Cir. 2013) (rejecting calculation of amount in controversy where only evidence provided was "a declaration by [defendants'] supervisor of payroll, which sets forth only the number of employees during the relevant period, the number of pay periods, and general information about hourly employee wages").

Bedi states that the information in his declaration is based upon his "personal knowledge and was obtained from the personnel data records kept in the ordinary course of business[.]" (Dkt. 10-1, Bedi Decl. at ¶ 1).  However, Bedi does not describe sufficiently the source of his personal knowledge.  See Casey v. Lewis, 4 F.3d 1516, 1527 (9th Cir. 1993) ("Conclusory [declarations] that do not affirmatively show personal knowledge of specific facts are insufficient."); AMCO Ins. Co. v. Madera Quality Nut LLC, 2006 WL 2091944, *5 (E.D. Cal. 2006) (stating that the "source of the [personal] knowledge must be disclosed" and that the "burden is on the proponent to establish personal knowledge to the extent that a reasonable trier of fact could believe that the witness had personal knowledge about the fact").  For example, Bedi does not describe with any particularity which records he reviewed to arrive at the figures he provides; whether he reviewed the personnel data himself or used summaries prepared by other employees; or when he reviewed the records and completed his investigation.  (See, generally, Dkt. 10-1, Bedi Decl.).

In reviewing the "summary-judgment-type evidence" required for a defendant to meet its burden on removal, see Ibarra, 775 F.3d at 1197, the court "can only consider admissible evidence[.]"  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see also Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]").  "In order to be considered by the court, documents must be authenticated by and attached to [a declaration] that meets the requirements of Fed. R. Civ. P. 56(e) and the [declarant] must be a person through whom the exhibits could be admitted into evidence." Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987) (internal quotation marks omitted); see also Orr, 285 F.3d at 773

1  ("[U]nauthenticated documents cannot be considered[.]"); Bias v. Moynihan, 508 F.3d 1212, 1224

2  (9th Cir. 2007) ("Rule 56(e) of the Federal Rules of Civil Procedure requires that . . . [t]he

3  documents must be authenticated and attached to a declaration wherein the declarant is the

4  person through whom the exhibits could be admitted into evidence.") (internal quotation marks

5  omitted).  Bedi's declaration neither attaches the records he reviewed nor attempts to establish

6  that they are authentic.  (See, generally, Dkt. 10-1, Bedi Decl.); see Fed. R. Evid. 901

7  (requirements for authentication of evidence).  For this reason alone, the court may disregard the

8  records and any information contained within them.  See Canada, 831 F.2d at 925 (holding that

9  the court cannot consider "documents which have not had a proper foundation laid to authenticate

10  them").

11         Bedi's declaration also does not establish that the records, or the employment and wage

12  statement figures that he claims are contained within the records, fall under any exclusion or

13  exception to the hearsay rule.[4]  See Fed. R. Evid. 801(d), 803-04 & 807 (hearsay exclusions and

14  exceptions); (see, generally, Dkt. 10-1, Bedi Decl.).  In stating that the records are "kept in the

15  ordinary course of business[,]" (Dkt. 10-1, Bedi Decl. at ¶ 1), Bedi makes an apparent attempt at

16  satisfying the business records exception, see Fed. R. Evid. 803(6)(B), but he fails to address the

17  other required elements of that exception.  See id. at 803(6)(A) (requiring that "the record was

18  made at or near the time [of the event described] by – or from information transmitted by –

19  someone with knowledge"); id. at 803(6)(C) (requiring that "making the record was a regular

20  practice"); id. at 803(6)(D) (requiring that "these conditions are shown by the testimony of a

21  custodian or another qualified witness, or by a certification"); (see, generally, Dkt 10-1, Bedi Decl.).

22         Nonetheless, at this stage, defendant "does not necessarily have to produce evidence in

23  a form that would be admissible at trial[.]"  Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th

24  Cir. 2001).  "It would be sufficient if the contents of the [records] are admissible at trial, even if the

25

26                                            

27  [4] To the extent that Bedi merely repeats employment and wage statement information that he read in company records, that information is not within his personal knowledge.  See AMCO Ins.

28  Co., 2006 WL 2091944, at *5 (citing Fed. R. Evid. 602) ("Personal knowledge consists of what a witness actually directly observed or perceived through his or her own senses.").

1  [records themselves] may be inadmissible." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir.

2  2003), cert. denied, 541 U.S. 937 (2004) (holding that the court "do[es] not focus on the

3  admissibility of the evidence's form" but rather "focus[es] on the admissibility of its contents"). Yet,

4  given the conclusory statements in Bedi's declaration and his failure to submit the records he

5  reviewed, the court has no basis from which to conclude that Bedi's declaration is sufficient to

6  meet defendant's burden on removal. See Abrego, 443 F.3d at 685; see, e.g., JL Beverage Co.,

7  LLC v. Jim Beam Brands Co., 2016 WL 3770484, *8 (9th Cir. 2016) (holding that district court may

8  disregard inadmissible hearsay evidence where defendant "has not argued that the hearsay

9  declarants would be available to testify at trial, or that its hearsay evidence would be admissible

10  at trial in some other form"); see also Fraser, 342 F.3d at 1037 (holding that, although plaintiff's

11  diary may not be admissible, "[t]he contents of the diary are mere recitations of events within

12  [plaintiff]'s personal knowledge and [plaintiff] could testify to all the relevant portions").

13      Moreover, Bedi states somewhat confusingly that the number of wage statements received

14  by each putative class member during the period from May 14, 2013, to July 29, 2015, was

15  calculated "based on the respective start and end dates reflected in the records[,]" which yields

16  one set of numbers, and also by "using a cap of 41 wage statements per associate," which yields

17  a different set of numbers.[5]  (See Dkt. 10-1, Bedi Decl. at ¶ 5).  He does not explain how or why

18  a 41-wage statement "cap" is appropriate, nor does he explain where he obtained the "respective

19  start and end dates" other than by referring to the "records discussed above[.]"  (See, generally,

20  id.).  Yet that discussion, as noted above, is conclusory and insufficient to constitute competent

21  evidence.

22      Additionally, Bedi's declaration uses an end date of July 29, 2015,[6]  (see Dkt. 10-1, Bedi

23

24      [5]  Bedi asserts that from May 14, 2013, to July 29, 2015, the number of subsequent wage

25  statements received by class members based on their "respective start and end dates" is "more
    than 25,000[,]" but that the number, if "calculated using a cap of 41 wage statements per

26  associate," is "more than 24,000[.]"  (See Dkt. 10-1, Bedi Decl. at ¶ 5).

27      [6]  Indeed, Bedi provides no explanation as to the relevance of the cut-off dates, (see Dkt. 10-1,
    Bedi Decl. at ¶¶ 2-3 & 5) (selecting May 14, 2011, May 14, 2013, and July 29, 2015, cut-off dates),

28  that he selected for his calculations.  (See, generally, id.).

1    Decl. at ¶¶ 2-3 & 5), even though the case was removed on July 15, 2015.  (See Dkt. 1, NOR);

2    see also Rea v. Michaels Stores Inc., 742 F.3d 1234, 1237 (9th Cir. 2014) ("[T]he general rule is

3    that the amount in controversy is determined from the pleadings as they exist at the time a petition

4    for removal is filed.") (internal quotation marks omitted).  Given defendant's allegations regarding

5    the large number of potential class members and wage statements at issue, which could result

6    in a calculation of minimum penalties that is substantially inaccurate, the court has no way of

7    determining whether the temporal scope difference is a minor discrepancy.   Assuming, for

8    example, that there was one pay period in those two weeks, (see Dkt. 10-1, Bedi Decl. at ¶ 4) ("A

9    pay period at Walmart covers two weeks."), defendant may have overestimated the number of

10   subsequent wage statements by as many as 1,330.[7]  With a penalty of $250 per subsequent wage

11   statement for minimum wage violations, see Cal. Lab. Code § 1197.1(a), defendant's calculation

12   for that claim may be overstated by more than $332,500.  Similarly, for plaintiffs' claim regarding

13   non-compliant wage statements, the statutory penalty is $100 per subsequent wage statement,

14   see Cal. Lab. Code § 226(e)(1), which may mean that defendant's calculation for plaintiffs' wage

15   statements claim is more than $133,000 too high.  While $332,500 for one claim and $133,000

16   for another may not, in and of themselves, push defendant above or below the CAFA threshold,

17   the underlying calculations and assumptions – among a number of others – cause the court to

18   question the basis, validity, and accuracy of Bedi's calculations.

19          In short, the court declines to rely on the Bedi declaration because it is simply not the

20   "summary-judgment-type evidence," see Ibarra, 775 F.3d at 1197, that is sufficient to support

21   defendant's assumption of a 100% violation rate.  See, e.g., Townsend, 2015 WL 3970172, at *4

22   ("The court is unable to discern whether [the declarant] reviewed actual employee time records

23   and pay records, whether he relied on summaries prepared for him by someone else, or whether

24   the records are something else entirely."); Garibay, 539 F.App'x at 764 (rejecting calculation of

25   amount in controversy where the only evidence provided was "a declaration by [defendants']

26   _____

27        [7]  If 1,370 of the 2,700 individuals employed as an APA left defendant's employment between
     May 14, 2011 and July 29, 2015, (see Dkt. 10-1, Bedi Decl. at ¶¶ 2-3), it is possible that the
28   remaining 1,330 APAs received a wage statement during the two-week period in July 2015.

1   supervisor of payroll, which set[] forth only the number of employees during the relevant period,

2   the number of pay periods, and general information about hourly employee wages"); Lockhart v.

3   Columbia Sportswear Co., 2016 WL 2743481, *4 (C.D. Cal. 2016) (finding declaration did not

4   support CAFA amount in controversy requirement due to its lack of specificity regarding the

5   records reviewed); Johnson v. Sunrise Sr. Living Mgmt., Inc., 2015 WL 3830291, *7-8 (C.D. Cal.

6   2015) (holding that defendant failed to meet its burden "to provide evidence justifying the use of

7   the full thirty-day statutory maximum" in calculating the amount in controversy for a waiting time

8   penalty claim); Brandon v. C.H. Robinson Co. Inc., 2014 WL 2624995, *3 (E.D. Cal. 2014) (finding

9   declaration stating that it was likely that majority of employees worked a certain number of hours

10  per week lacked foundation); Ornelas v. Children's Place Retail Stores, Inc., 2013 WL 2468388,

11  *4 (C.D. Cal. 2013) ("A declaration stating the number of employees who worked for Defendant

12  during the years prior to this action, together with assumptions about these employees, is not

13  sufficient to establish that it is more likely than not that the amount in controversy in this case

14  exceeds $5 Million."); see also AMCO Ins. Co., 2006 WL 2091944, at *5 (stating that the "source

15  of the [personal] knowledge must be disclosed" and that the "burden is on the proponent to

16  establish personal knowledge to the extent that a reasonable trier of fact could believe that the

17  witness had personal knowledge about the fact").

18      Even assuming defendant had submitted admissible, summary-judgment-type evidence,

19  the result would not change because plaintiffs' allegations do not warrant the use of a 100%

20  violation rate with respect to the claims on which defendant relies for purposes of removal.

21  Defendant repeatedly asserts that "Plaintiffs' own allegations supported a 100%-violation rate

22  calculation."[8]   (Dkt. 13, Opp. at 11; see id. at 2, 12 & 19).   Defendant focuses on plaintiffs'

23

24      [8]   However, defendant apparently contradicts itself in other portions of its briefing, when it
    states that plaintiffs' allegations are insufficient to establish the amount in controversy. (See, e.g.,
25  Dkt. 13, Opp. at 5 ("[T]hese pleadings were indeterminate and did not reveal on their face the facts
    necessary for federal jurisdiction."); id. at 6 ("Plaintiffs do not – because they cannot – point to any
26  subsequent pleading or any other paper served on Defendant that supposedly revealed the
    jurisdictional facts necessary for removal.  The First Amended Complaint in Garcia and the CAC
27  each suffers from the same deficiency as the original complaints."); id. at 6 ("Neither of the initial
28  complaints alleged an amount in controversy exceeding $5 million, nor did they include 'figures

allegations of a "uniform policy and systematic scheme of wage abuse" that was in place "[a]t all material times."[9]  (See id. at 9; see also Dkt. 1-8, CAC at ¶¶ 27 & 40).  However, plaintiffs' allegations state that "[a]t all material times set forth herein, Defendants failed to pay Plaintiffs and the other class members at least minimum wages for all hours worked."  (Dkt. 1-8, CAC at ¶ 40); see Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 449 (7th Cir. 2005) ("[P]art of the removing party's burden is to show not only what the stakes of the litigation could be, but also what they are given the plaintiff's actual demands.") (emphasis in original).  Other paragraphs in the CAC allege that APAs "were entitled to receive at least minimum wages for compensation [but] that they were not receiving at least minimum wages for all hours worked[,]" (Dkt. 1-8, CAC at ¶ 32), and that they seek to recover the "unpaid balance of their minimum wage compensation."  (Id. at ¶ 79) (emphasis added).

Defendant relies on cases that have found it reasonable to assume a 100% violation rate based on similar allegations.  (See Dkt. 13, Opp. at 12-13) (discussing, e.g., Duberry v. J. Crew Grp., Inc., 2015 WL 4575018 (C.D. Cal. 2015) and Mejia v. DHL Express (USA), Inc., 2015 WL 2452755 (C.D. Cal. 2015)).  However, "[t]he Court disregards the argument that the existence of other class actions in federal court somehow demonstrates jurisdiction. The Court is basing its ruling solely on the allegations in this Complaint and the evidence submitted." Vasquez v. Blue Cross of Cal., 2015 WL 2084592, *5 (C.D. Cal. 2015) (internal citation omitted).  The allegations and supporting evidence in each case are unique and, just as some courts have found it reasonable to assume a 100% violation rate based on allegations similar to those in this case, other courts have found those allegations insufficient to support a 100% violation rate.  See, e.g., Garcia v. Lifetime Brands, Inc., 2016 WL 81473, *3 (C.D. Cal. 2016) (rejecting use of 100% violation rate based on allegations in the complaint that defendant employed "a uniform policy and

---

clearly stated' that could be multiplied to ascertain removability.")).

[9]  The Ortiz and Garcia Actions also included the same language regarding Wal-Mart's "uniform policy and systematic scheme of wage abuse," (see Dkt. 1-7, Ortiz Action at ¶ 28; Dkt. 1-4, Garcia Action at ¶ 25), that was in place "[a]t all material times."  (Dkt. 1-7, Ortiz Action at ¶¶ 4-48; Dkt. 1-4, Garcia Action at ¶¶ 36-43).

systematic scheme of wage abuse, and that it denied meal and rest periods at all material times") (internal quotation marks omitted); see also Duberry, 2015 WL 4575018, at *3 ("The cases venturing into this murky area are not all of one mind.").

In any event, the court is not persuaded that the allegations in the CAC are sufficient to support defendant's assumptions and calculations.[10]  As the Garcia court noted, "the allegations at issue here – that the defendant employs a 'uniform policy and systematic scheme of wage abuse,' and that violations occur 'at all material times' – are notably similar in form and substance to the allegations at issue in Ibarra." 2016 WL 81473, at *3.  Under the circumstances, the court is not persuaded that the language in the CAC, (see Dkt. 1-8, CAC at ¶ 27) (e.g., "uniform") is materially different for purposes of assessing the amount in controversy from the language in Ibarra, 775 F.3d at 1198-99 (e.g., "pattern and practice").  See Garcia, 2016 WL 81473, at *3. Here, as in Ibarra, nothing in the CAC "allege[s] that [defendant] universally, on each and every [day]," 775 F.3d at 1199, violated labor laws with respect to minimum wage payments.

In a class action, it is not necessary for a class representative to establish that the class members were universally denied a right (e.g., minimum wage, breaks, etc.) to which they are entitled under the California Labor Code to obtain class certification.  In other words, class proponents are not required to establish the universal application of an allegedly illegal policy; rather, a class representative need only show a consistent application of the challenged policy or practice. See Alberts v. Aurora Behavioral Health Care, 241 Cal.App.4th 388, 409 (2015).  Thus, the most reasonable reading of plaintiffs' allegations is not that defendant failed to pay minimum wages during every single day, week, or pay period, but rather that defendant had a policy, which was in place at all material times, that led to plaintiffs being underpaid to some degree.  Here, the CAC does not allege that plaintiffs were never paid minimum wages, or that there were never pay periods in which they were paid proper minimum wages.  (See, generally, Dkt. 1-8, CAC).  The CAC simply does not set forth how often such underpayment occurred, nor has defendant

---

[10]  This is made even more apparent when one takes into account the insufficiency of the evidence submitted by defendant to justify its 100% violation rate.

1  presented, as noted above, any competent evidence regarding the frequency of the alleged

2  underpayment.

3       In short, based on the foregoing, the court finds that defendant has failed to carry its burden

4  to show by a preponderance of the evidence that the amount in controversy exceeds the CAFA

5  jurisdictional threshold.[11] See Marentes v. Key Energy Servs. California, Inc., 2015 WL 756516,

6  *10 (E.D. Cal. 2015) ("Because [defendant] fails to provide facts supporting the calculations,

7  Defendant has failed to carry the burden to demonstrate by a preponderance of the evidence that

8  the amount of damages in controversy exceeds $5,000,000."); Moore v. Urban Outfitters

9  Wholesale, Inc., 2014 WL 2212080, *2 (N.D. Cal. 2014) (holding in wage and hour case that "an

10  estimation, which assumes time worked, estimates missed overtime per week without reference

11  to actual workweeks worked, and estimates number of employees working at any one time, is

12  unsupported by underlying facts, is speculative, and falls short of meeting the preponderance of

13  the evidence burden"); Garcia, 2016 WL 81473, at *3 (rejecting use of 100% violation rate based

14  on allegations in the complaint that defendant employed "a uniform policy and systematic scheme

15  of wage abuse, and that it denied meal and rest periods at all material times") (internal quotation

16  marks omitted); see also Ibarra, 775 F.3d at 1197 ("[A] defendant cannot establish removal

17  jurisdiction by mere speculation and conjecture, with unreasonable assumptions.").

18  II.    TIMELINESS OF REMOVAL.

19       While a defendant may "remove outside the two thirty-day periods on the basis of its own

20  information," Roth v. CHA Hollywood Med. Ctr., L.P., 720 F.3d 1121, 1125 (9th Cir. 2013), the

21  information must – when questioned by plaintiff or the court – constitute "summary-judgment-type

22  evidence," Ibarra, 775 F.3d at 1197, that is sufficient "to persuade the court that the estimate of

23  damages in controversy is a reasonable one," id., or otherwise makes the case removable.[12]

24                          _____

25     [11] Given the court's finding that defendant's calculations based on a 100% violation rate are

26  unsupported by either evidence or the allegations in the CAC, the court need not consider
defendant's attorney's fee calculation. (See Dkt. 13, Opp. at 20-21).

27     [12] For example, in Roth, upon receiving the first amended complaint, the defendant promptly

28  consulted its employment files to identify potential class members and "quickly located" a former
employee who was a citizen of another state. See 720 F.3d at 1125. Similarly, in Rea, the Ninth

Here, as noted above, see supra at § I., the evidence put forth by defendant is insufficient to make the case removable.  See, e.g., McNulty v. CRST Van Expedited, Inc., 2015 U.S. Dist. LEXIS 4569, *6 (C.D. Cal. 2015) ("[T]he Ninth Circuit has not permitted removal outside of [the 30-day] periods based upon speculation and guesswork by a removing party.  In contrast to the facts of Roth and Rea, Defendants do not ground their removal in facts firmly established through their own investigation or a change in the governing law.  Instead, Defendants essentially speculate[.]"); Rosales v. Staples Contact & Commercial, Inc., 2015 WL 4537577, *4 (C.D. Cal. 2015) ("Defendant's assumption of a 100 percent violation rate is not the `summary-judgment-type evidence' needed to demonstrate that the amount in controversy exceeds $5,000,000 by a preponderance of the evidence.").  But even assuming defendant had met its burden of providing "summary-judgment-type evidence" to satisfy the amount in controversy requirement under CAFA, the instant matter would still be remanded as defendant's removal was untimely.

Defendant asserts that the initial complaints in the Garcia and Ortiz Actions "were indeterminate and did not reveal on their face the facts necessary for federal jurisdiction." (Dkt. 13, Opp. at 5).  Defendant also asserts there is no "subsequent pleading or any other paper served on Defendant that supposedly revealed the jurisdictional facts necessary for removal.  The First Amended Complaint in Garcia and the CAC each suffers from the same deficiency as the original complaints."  (Id. at 6).  Finally, relying on Roth, defendant contends that because no pleading or other paper revealed that the case was removable, "Defendant was permitted at any time to supply additional information and data to demonstrate that the amount in controversy exceeds $5 million." (Id. at 8) (emphasis in original).  Defendant's assertions are unpersuasive.

As an initial matter, defendant's assertions are belied by its contentions relating to the amount in controversy.  Indeed, defendant appears to contradict itself as to whether the complaints in this action were sufficient to state facts to make the case removable.  For example, defendant states the following:

_____

Circuit found that removal was proper outside the 30-day window when a change in law, announced by the Supreme Court just one day before defendant's removal, meant that the amount in controversy exceeded the federal jurisdictional threshold.  See 742 F.3d at 1236-37.

-     "Plaintiffs do not – and cannot – explain how any pleading or other paper served by Plaintiffs on Defendant was removable on its face."  (Dkt. 13, Opp. at 1);

-     "[T]hese pleadings were indeterminate and did not reveal on their face the facts necessary for federal jurisdiction."  (Id. at 5).

-     "Neither of the initial complaints alleged an amount in controversy exceeding $5 million, nor did they include 'figures clearly stated' that could be multiplied to ascertain removability."  (Id. at 6).

-     "Plaintiffs do not – because they cannot – point to any subsequent pleading or any other paper served on Defendant that supposedly revealed the jurisdictional facts necessary for removal.  The First Amended Complaint in Garcia and the CAC each suffers from the same deficiency as the original complaints."  (Id.).

Defendant then states that its "calculations were based on Plaintiffs' own allegations, namely Plaintiffs' claim that Defendant committed the alleged labor code violations 'at all material times' as part of a 'uniform policy and systematic scheme of wage abuse.'" (Dkt. 13, Opp. at 2). According to defendant, "Plaintiffs' own allegations supported a 100%-violation rate calculation." (Id. at 11).  Defendant cannot have it both ways – either the allegations in plaintiffs' pleadings were sufficient to ascertain the amount in controversy or they were indeterminate and no 30-day period was triggered. If, as defendant asserts, its "calculations were based on Plaintiffs' own allegations," (id. at 2), then plaintiffs' action was removable all along – at least since the filing of the Ortiz Action on November 27, 2013, or the filing of the Garcia Action on May 14, 2014 – and defendant missed the two 30-day deadlines.  See 28 U.S.C. §§ 1446(b)(1) & (3); Kuxhausen v. BMW Financial Serv., 707 F.3d 1136, 1140 (9th Cir. 2013) (While a defendant "need not make extrapolations or engage in guesswork[,] . . . the statute requires a defendant to apply a reasonable amount of intelligence in ascertaining removability.") (internal quotation marks omitted).  Defendant cannot "ignore pleadings or other documents from which removability may be ascertained and seek removal only when it becomes strategically advantageous for it to do so."  Roth, 720 F.3d at 1125.

Assuming, arguendo, that defendant had not based its removal on "Plaintiffs' own allegations," (see Dkt. 13, Opp. at 2 & 11), because the complaints were, as defendant contends,

1  indeterminate and the § 1446(b) 30-day removal periods had not been triggered, and thus

2  defendant could "remove at any time 'on the basis of its own information[,]'" (id. at 7), the instant

3  removal was still improper.  "The facts and circumstances in this case . . . strongly suggest that

4  [defendant] could have reasonably and intelligently ascertained the amount in controversy well

5  before [July 15, 2015]." Levanoff v. Socal Wings LLC, 2015 WL 248338, *2 (C.D. Cal. 2015).  As

6  an initial matter, defendant does not state when it conducted and completed its investigation, i.e.,

7  when it discovered the facts making the case removable on CAFA grounds.  (See, generally, Dkt.

8  1, NOR; Dkt. 10, OSC Response; Dkt. 10-1, Bedi Decl.; Dkt. 13, Opp.).  Further, as noted earlier,

9  the burden is on defendant to establish that the case is removable on CAFA grounds and, "in

10  evaluating whether a removing defendant has met its burden, it is proper for courts to consider

11  which party has access to or control over the records and information required to determine

12  whether the amount in controversy requirement is met." Letuligasenoa, 2014 WL 2115246, at *5;

13  see Amoche v. Guarantee Trust Life Ins. Co., 556 F.3d 41, 51 (1st Cir. 2009) ("In the course of

14  [CAFA removal] evaluation, a federal court may consider which party has better access to the

15  relevant information.").  Since a defendant in an employment or wage and hour case will almost

16  always have the information (e.g., number and identity of employees) that a plaintiff needs to

17  determine the amount in controversy or the citizenship of the class members, a defendant who

18  removes "on the basis of its own information," Roth, 720 F.3d at 1125, must, when questioned by

19  plaintiff or the court, provide "summary-judgment-type evidence," Ibarra, 775 F.3d at 1197, as to

20  when defendant – based on its own information – determined that the case was removable on

21  CAFA grounds.  See Jordan, 781 F.3d at 1180 ("[A] defendant may remove a case from state

22  court within thirty days of ascertaining that the action is removable under CAFA[.]"); Goodman v.

23  Wells Fargo Bank, N.A., 602 F.App'x 681, 681-82 (9th Cir. 2015) ("[A] defendant may remove a

24  case from state court within thirty days of ascertaining that the action is removable under CAFA

25  . . . from information it discovers itself, or based on intervening case law[.]") (internal citations and

26  quotation marks omitted); Sullivan v. Conway, 157 F.3d 1092, 1094 (7th Cir. 1998) (noting that

27  the time begins to run upon occurrence of an event "that discloses that the case is or has become

28  removable").  This information is not only necessary to satisfy defendant's removal burden but will

also prevent gamesmanship and bad faith removals.  Cf. Tedford v. Warner-Lambert Co., 327 F.3d 423, 426-29 (5th Cir. 2003) (in affirming denial of motion to remand, court stated that "[s]ection 1446(b) is not inflexible, and the conduct of the parties may affect whether it is equitable to strictly apply" the requirements of § 1446(b) where plaintiff "attempted to manipulate the statutory rules [28 U.S.C. § 1446(b)] for determining federal removal jurisdiction").

Here, the Bedi declaration does not state when defendant completed its investigation and determined that the case was removable on CAFA grounds.  (See, generally, Dkt. 10-1, Bedi Decl.).  The only indication, albeit implicit, that defendant gives of when it determined the case was removable on CAFA grounds is a footnote in its opposition stating that "Defendant removed this case promptly after the CAC was filed, a logical and reasonable time within which to effect removal." (Dkt. 13, Opp. at 8 n. 7).  But if "the CAC suffer[ed] from the same deficiency as the original complaints," (id. at 6), i.e., they were indeterminate because they failed to reveal facts necessary for removal, then why was it "logical and reasonable . . . to effect removal[,]" (id. at 8 n. 7), 13 days after the CAC was filed?[13]  Defendant never explains why it was logical and reasonable to remove after the CAC was filed, (see, generally, id. at 6-8), but if, as defendant contends, it could remove at any time based on its own investigation, then there is no need to base its removal on the filing of the CAC or any other pleading or paper.

Defendant's calculations suggest why defendant believed it was "logical and reasonable . . . to effect removal[,]" (Dkt. 13, Opp. at 8 n. 7), 13 days after the CAC was filed.  While the Garcia and Ortiz complaints each indicated that the membership of the respective classes was greater than 200, (see Dkt. 1-7, Ortiz Action at ¶ 16.a; Dkt. 1-4, Garcia Action at ¶15.a), the CAC indicates that the class size was greater than 2,400.  (See Dkt. 1-8, CAC at ¶ 16.a).  Defendant does not argue or otherwise contend that the increase in class members in the CAC was the basis for its removal on July 15, 2015.  (See, generally, Dkt. 13, Opp.).  Indeed, defendant claims that "just knowing the putative class size is not enough to calculate an amount in controversy

---

[13]   One could also ask, if "the CAC suffer[ed] from the same deficiency as the original complaints," (Dkt. 13, Opp. at 6), why was it "logical and reasonable . . . to effect removal[,]" (id. at 8 n. 7), 13 days after the CAC was filed, but not after the Ortiz or Garcia complaints were filed?

1    exceeding $5 million[.]"  (Id. at 7 n. 6).

2        Perhaps the reason why defendant takes the position that knowing the number of class

3    members was insufficient to calculate the amount in controversy, (see Dkt. 13, Opp. at 7 n. 6), is

4    because defendant's written responses to discovery propounded by plaintiffs indicate that

5    defendant investigated the number of class members as early as May 15, 2014 – one day after

6    the Garcia Action was filed and over one year before it removed this action – and determined that

7    the class was comprised of approximately 2,600 class members.  (See Dkt. 1-4, Garcia Action;

8    Dkt. 14-4, Declaration of Arby Aiwazian [] ("Aiwazian Decl.") at Exh. C).  In defendant's May 15,

9    2014, responses to interrogatories in the Ortiz Action, defendant stated that it had identified "1,506

10   individuals who formerly worked as Asset Protection Associates at Walmart retail stores and

11   supercenters in the State of California between November 27, 2009 and April 15, 2014," and

12   "1,142 individuals who are current associates at Walmart and work or worked as Asset Protection

13   Associates at Walmart retail stores and supercenters in California."  (Dkt. 14-4, Aiwazian Decl.,

14   Exh. C at 4).  In other words, more than one year before removing the instant action, Walmart had

15   determined, based on its own investigation, that there were 2,648 class members.  (See id.;

16   compare id. with Dkt. 10-1, Bedi Decl. at ¶¶ 2-3 (identifying 2,700 past and current Asset

17   Protection Associates from May 14, 2011, to July 29, 2015)).

18       As plaintiffs note, "[t]he only 'facts' Defendant uses to support its calculations are the

19   number of putative class members during the statutes of limitations periods and the number of pay

20   periods."  (Dkt. 14, Plaintiffs' Reply in Support of Plaintiffs' Motion to Remand ("Reply") at 3); see

21   Dkt. 10-1, Bedi Decl. at ¶ 5).  It is evident that defendant, after obtaining the number of putative

22   class members set forth in the CAC, simply calculated the amount in controversy by multiplying

23   the number of pay periods within an arbitrary set of cut-off dates, see supra at § I & n. 5-6, for the

24   three labor code provisions upon which it based its removal.[14]  However, this simple computation

25   could have been performed in May 2014, when defendant determined and provided discovery

26

27   _____

28       [14]  This of course generated a maximum violation rate, not an actual or even a reasonable
     violation rate.

20

1   responses indicating that there were more than 2,600 putative class members.

2        While a defendant "need not make extrapolations or engage in guesswork" to determine

3   the amount in controversy, a defendant is required "to apply a reasonable amount of intelligence

4   in ascertaining removability." See Kuxhausen, 707 F.3d at 1140 (internal quotation marks

5   omitted). For instance, in Doss v. Albertson's LLC, 492 F.Supp.2d 690 (W.D. Tex. 2007), the

6   court remanded an age discrimination case in which plaintiff sought compensatory damages,

7   including front pay and back pay. The initial complaint did not specify a damages amount but the

8   amended complaint set a maximum damages amount of $750,000. Id. at 691-92. Although

9   defendant removed within 30 days of receiving the amended complaint, the court remanded as

10  untimely because defendant had earlier received discovery responses that indicated the salary

11  and time frame for which front and back pay were being sought, and a simple computation would

12  have revealed that the damages claim exceeded the jurisdiction amount for diversity jurisdiction.

13  Id. at 694. The court explained that although defendant was not required to "engage in due

14  diligence to determine the extent of Plaintiff's allegations," a "simple computation" would have

15  shown that plaintiff's claim exceeded the diversity jurisdictional threshold. Id. ("[T]he Court relies

16  on an objective reading of Plaintiff's allegations, aided by a modicum of effort and a couple of

17  simple mental calculations.") (internal quotation marks omitted). Here, given the variables

18  defendant relies on to arrive at the calculations upon which it bases its removal, the court is

19  persuaded that defendant could have – based on defendant's May 15, 2014, discovery responses

20  – ascertained removability more than a year before the instant case was removed. In other words,

21  Wal-Mart, like the defendant in Doss, could have, as early as May 2014, performed a simple

22  computation to determine whether the three claims it relies on for removal were sufficient to

23  ascertain whether the case was removable on CAFA grounds.

24       As noted above, defendant never identifies the date on which it completed its investigation

25  on the basis of its own information. Without knowing that date, the court cannot determine

26  whether defendant removed the case within 30 days of ascertaining that the case was removable

27  on CAFA grounds. See Jordan, 781 F.3d at 1184 ("[W]e hold that a case becomes `removable'

28  for purposes of section 1446 when the CAFA ground for removal is first disclosed."); Goodman,

602 F.App'x at 681-82 ("[A] defendant may remove a case from state court within thirty days of ascertaining that the action is removable under CAFA . . . from information it discovers itself, or based on intervening case law[.]") (internal citations and quotation marks omitted).

Nevertheless, even assuming defendant had not determined that the case was removable on CAFA grounds (i.e., completed its investigation) – in response to plaintiffs' discovery requests – as early as May 2014, there is no doubt that as of April 8, 2015, more than 30 days before it removed the instant action, defendant was on notice that the case was removable.  On April 8, 2015, the class action administrator provided the class contact information for approximately 2,412 individuals, (see Dkt. 11-1, Declaration of Jill J. Parker in Support of Plaintiff[s'] Reply to Defendant Wal-Mart Stores, Inc.'s Response to Order to Show Cause Re: Remand at ¶ 3; see also Dkt. 12, Motion at 7 n. 1), thus confirming the May 15, 2014, results of defendant's own investigation.[15] (See Dkt. 14-4, Aiwazian Decl., Exh. C at 4).  Once a defendant receives a pleading or other document that contains information from which removability may be ascertained, defendant has an obligation "to apply a reasonable amount of intelligence in ascertaining removability."

---

[15]  Defendant attempts to minimize plaintiff's discussion regarding the production of the class list information by the neutral class action administrator by stating that it "misses the point" and because it was not "an 'other paper' served on Defendant[.]"  (Dkt. 13, Opp. at 7 n. 6).  Defendant does not explain how the list produced by the neutral class action administrator "misses the point." (See, generally, Dkt. 13, Opp.).  In other words, it does not explain why it could not take the number of class members on the list and multiply it by the number of pay periods within the statute of limitations period.  Further, the class-list information constitutes an "other paper" as it is a discovery document that was generated during the state court case.  See, e.g., Lowery v. Alabama Power Co., 483 F.3d 1184, 1212 n. 62 (11th Cir. 2007), cert. denied, 553 U.S. 1080 (2008) (The term "other paper" includes written discovery responses, settlement offers, demand letters, deposition testimony, and correspondence between counsel); Peters v. Lincoln Elec. Co., 285 F.3d 456, 465-466 (6th Cir. 2002) (deposition testimony serves as "other paper" to trigger removal period).  Finally, the fact that the document was served by a neutral class action administrator does not change the significance of the document.  See Vagle v. Archstone Communities, LLC, 2014 WL 2979201, *5-7 (C.D. Cal. 2014) (court, in finding that document filed by a co-defendant from which removability could be ascertained constituted "other paper," stated that "a defendant's receipt of a paper from a plaintiff is one way, but not the only way, that the removal window can be triggered.  It does not mean that a paper must be received from a plaintiff to trigger the window") (emphasis in original); Pretka v. Kolter City Plaza II, Inc., 608 F.3d 744, 765 (11th Cir. 2010) ("[I]t has never been the jurisdictional rule that defendant may remove a diversity case seeking unliquidated damages only when the plaintiff is the source of facts or evidence on the value of the case.").

1  Kuxhausen, 707 F.3d at 1140 (internal quotation marks omitted).  "A defendant should not be able

2  to ignore pleadings or other documents from which removability may be ascertained and seek

3  removal only when it becomes strategically advantageous for it to do so."  Roth, 720 F.3d at 1125;

4  see e.g., Brown v. Demco, Inc., 792 F.2d 478, 481 (5th Cir. 1986) ("In the absence of waiver of

5  the time limit by the plaintiff, or some equitable reason why that limit should not be applied, . . . a

6  defendant who does not timely assert the right to remove loses that right.")  E & J. Gallo Winery

7  v. Encana Energy Servs., Inc., 388 F.Supp.2d 1149, 1161-62 (E.D. Cal. 2005) (noting in forum

8  selection context that a "party cannot sit on its . . . rights").  Given that the class members were

9  and are defendant's employees and defendant was in a better position than plaintiffs to investigate

10  the size of the class, see Letuligasenoa, 2014 WL 2115246, at *5; Amoche, 556 F.3d at 51, there

11  is no doubt that defendant could and should have applied "a reasonable amount of intelligence"

12  and ascertained removability at least as early as April 8, 2015.  See Kuxhausen, 707 F.3d at 1140.

13  Thus, even assuming defendant had not completed its investigation and determined removability

14  on CAFA grounds of the instant action as early as May 2014, defendant's failure to remove the

15  instant action within 30 days of April 8, 2015, renders the instant removal untimely.  See Doss, 492

16  F.Supp.2d at 693-94.

17          Finally, the court is a little wary of the instant removal because there appears to be "the

18  theoretical possibility" that the instant removal was motivated by the "gamesmanship" about which

19  the Ninth Circuit was concerned in Roth.  See 720 F.3d at 1126 ("But the theoretical possibility of

20  abusive gamesmanship remains.").  On May 18, 2015, this court denied class certification in

21  Zackaria v. Wal-Mart Stores, Inc., 2015 WL 2412103, *17 (C.D. Cal. 2015) ("Zackaria Action"),[16]

22  a case involving similar employees (i.e., Asset Protection Coordinators/Managers) and the same

23

24

_____

25      [16]  The Zackaria Action, which has since settled, was transferred to the undersigned when he
26  first became a district judge.  As such, the court had no occasion to consider the removability of
    that action.  In any event, "[t]he Court disregards the argument that the existence of other class
27  actions in federal court somehow demonstrates jurisdiction[,]" as the court "is basing its ruling
    solely on the allegations in this Complaint and the evidence submitted."  Vasquez, 2015 WL
28  2084592, at *5.

1   attorneys for defendant.  Arguably, after this court had shown itself ill-disposed to plaintiffs' case,[17]

2   defendant removed the instant action,[18] – one year after defendant responded to plaintiffs' written

3   discovery stating that the class exceeded 2,600 members and 40 days after the class

4   administrator confirmed the class size to defendant.  See Roth, 720 F.3d at 1126 ("It is thus at

5   least theoretically possible in a CAFA case for a defendant to wait until the state court has shown

6   itself ill-disposed to defendant, or until the eve of trial in state court, before filing a notice of

7   removal.").

8        The court also notes that defendant takes conflicting positions with respect to whether

9   plaintiffs' allegations are sufficient to calculate the amount in controversy and, despite taking the

10  position that knowing the class size is not enough to calculate the amount in controversy, (Dkt. 13,

11  Opp. at 7 n. 6), the only substantive change in plaintiffs' allegations between the original Ortiz and

12  Garcia complaints and the CAC were the allegations relating to the size of the class.  (See Dkt.

13  1-7, Ortiz Action at ¶ 16.a (200 class members); Dkt. 1-4, Garcia Action at ¶15.a (200 class

14  members); Dkt. 1-8, CAC at ¶ 16.a (2,400 class members)).  Indeed, defendant's calculations

15  reveal that the only variables it used to calculate the amount in controversy were the number of

16  class members and the number of pay periods within an arbitrary set of dates.  (See Dkt. 10-1,

17  Bedi Decl. at ¶ 5).  Yet, on May 15, 2014, one day after the Garcia Action was filed, defendant had

18  already ascertained that the class size exceeded 2,600 class members (and concomitantly, the

19  associated number of pay periods); and on April 8, 2015, received a document confirming the

20  estimated number of class members and associated pay periods from which it could have

21

22   _____

23      [17]  There is no indication that the state court became ill-disposed to defendant's case.  Indeed,
    in September 2014, defendant sought coordination of the Ortiz and Garcia Actions, and argued
24   that Judge William F. Highberger should preside over both cases.  (See Dkt. 1-1, NOR, Exh. A at
    ECF 84-94).  The petition to coordinate was granted on November 21, 2014, (see Dkt. 12, Motion
25   at 3), and the coordinated cases were assigned for all purposes to Judge Highberger and
    subsequently consolidated.  (See Dkt. 1-1, NOR, Exh. A at ECF 25).  Thus, defendant had
26   obtained what it sought – coordination and consolidation of the cases before Judge Highberger.

27      [18]  The instant case was randomly assigned to this court.  However, had the case been
    assigned to another judge, it is likely that it would have been re-assigned to this court as a related
28   case pursuant to the Central District's local rules.

reasonably and intelligently ascertained the amount in controversy.  It appears that defendant chose to remain ignorant of the meaning of certain objective facts from which removability could easily have been ascertained, perhaps hoping that it could rely on "other papers" to remove the matter at a later, more advantageous time.

**CONCLUSION**

Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiffs' Motion to Remand **(Document No. 12)** is **granted**.

2.  The above-captioned action shall be **remanded** to the Superior Court of the State of California for the County of Los Angeles, 600 South Commonwealth Ave., Los Angeles, CA 90005, for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447(c).

3.  The Clerk shall send a certified copy of this Order to the state court.

Dated this 19th day of September, 2016.

                                                          /s/
                                              Fernando M. Olguin
                                              United States District Judge